Robert S. Schachter (*pro hac vice* forthcoming)
Jessica C. Hermes (*pro hac vice* forthcoming)
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
rshachter@zsz.com
jhermes@zsz.com

Ahmet Seyithanoglu (*pro hac vice* forthcoming)
**SEYITHAN LAW PC**
5 Penn Plaza, 23rd Floor
New York, NY 10001
Telephone: (216) 414-8426
as@seyithanlaw.com

Barrett S. Litt (SBN 44527)
**MCLANE, BEDNARSKI + LiTT, LLP**
975 East Green Street
Pasadena CA 91106
Telephone: (626) 844-7660
blitt@mbllegal.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ahmet S. Yayla, Selcuk Atak, and Murat Kalyoncu, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Refinitiv US LLC, and Does 1-10, inclusive,<br><br>                    Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Ahmet S. Yayla ("Yayla"), Selcuk Atak ("Atak"), and Murat Kalyoncu ("Kalyoncu" and together with Yayla and Atak, the "Plaintiffs"), individually, and on behalf of all others similarly situated, by their attorneys, allege the following against Defendants Refinitiv US LLC and Does 1 to 10, inclusive, ("Refintiv" or "Defendants"), based on personal knowledge as to themselves and upon the investigation of counsel as to the other allegations, as follow.

## I. NATURE OF THE ACTION

1.      Plaintiffs bring this action as a class action on behalf of themselves, and all others similarly situated, who have been identified by the Defendants as a terrorist, and in some instances denied access to various financial websites and accounts because of the actions of the Defendants in listing those persons on a terrorist watch list generated by the Turkish government, which the U.S. government has disparaged.

2.      Plaintiffs bring this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1962(c)-(d)), California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), the consumer protection statutes of the States of Illinois (815 ILCS §§ 505/1, *et seq*. and 815 ILCS §§ 510/1, *et seq.*) and New York (N.Y. GBL § 349), and the defamation statutes and common law of California, Illinois, Maryland, New Jersey, New York, Pennsylvania, and Virginia.

3.      Plaintiffs have been and/or continue to be subject to financial damage and seek monetary and injunctive relief.

## II. BACKGROUND

4.      In April 2021, and again in December 2021, the Turkish government adopted two decisions, Decision No. 2021/1 and Decision No. 2021/5, respectively. The Decisions froze assets located in Turkey of 660 individuals who are allegedly affiliated with the Gülen Movement ("GM").

5.      Decision Nos. 2021/1 and 2021/5 were ostensibly adopted in accordance

with the Turkish government's Law on the Prevention of the Financing of Terrorism No. 6415.

6.     The 660 individuals named in the two decisions included journalists, academics, authors, teachers, and lawyers targeted for politically motivated persecution.

7.     President Recep Tayyip Erdoğan ("Erdoğan"), a member of the Adalet ve Kalkınma Partisi ("AKP"), is, and at all relevant times was, the leader of the Turkish government.

8.     The AKP routinely describes opponents, including members of the GM, as "terrorists."

9.     The GM is a faith-based group founded in the 1960s by Fethullah Gülen ("Gülen").

10.     The GM and AKP were close allies between 2002 and 2013, with Erdoğan and his ministers praising the GM in public and granting public funds to GM-affiliated educational and health institutions.

11.     According to the Commissioner for Human Rights of the Council of Europe, "There seems to be general agreement that it would be rare for a Turkish citizen never to have had any contact or dealings with [the GM]," which had "a pervasive and respectable presence in all sectors of Turkish society, including religious institutions, education, civil society and trade unions, media, finance and business".

12.     According to a legal opinion submitted to the European Court of Human Rights by the Italian Helsinki Committee, after 2016 public prosecutors and courts across Turkey adopted a list of variables to determine whether an individual is a member of GM, which include the following:

        a.  depositing money at Bank Asya;

        b.  using or downloading the Bylock messaging application;

        c.  engaging in certain social media activity and visiting certain

websites;

    d.  donations made to relief organizations with alleged GM links, such as Kimse Yok Mu;

    e.  being a resident or a student in schools, universities, or dormitories, or sending children to schools, closed under the state of emergency because of alleged GM links; and

    f.  being a manager, employee, or member of a trade union, association, foundation, or company that has been closed, dissolved, or seized under the state of emergency because of its alleged GM links.

13.    In the early 2010s, the GM fell out of favor with the AKP, resulting in Turkish prosecutors alleging offenses of "commanding an armed organization" under Article 314 of the Turkish Penal Code against hundreds of thousands of individuals.

14.    Over eight thousand charges were filed in 2013, 146,731 charges were filed in 2017, 115,753 charges were filed in 2018, 54,464 charges were filed in 2019, and 33,885 charges were filed in 2020.

15.    The situation worsened after the 2016 coup attempt in Turkey, with the application of anti-terrorism laws becoming more abusive and arbitrary.

16.    The Turkish government blamed the attempted coup on Gülen.

17.    Gülen has denied any involvement in the attempted coup.

18.    The Turkish government also accused the United States of orchestrating the attempted coup with the assistance of members of the GM, which the State Department has said is "wholly false".

19.    In July 2017, the Turkish Court of Cassation[1] adjudicated that the GM, known by the Turkish government as Fethullahçı Terör Örgütü/Paralel Devlet Yapılanması ("FETÖ"), is a terrorist organization.

20.    None of the variables used to identify members of the GM comport with international treaties, international human rights conventions, or legal frameworks on

---

[1] The Republic of Turkey's highest court of appeal.

combatting terrorism in the UN, EU, or Council of Europe.

21.    Many of the supposed Gülenists have only tenuous links to the GM, such as having an account at Bank Asya.

22.    For instance, the United Nations Human Rights Council Working Group on Arbitrary Detention found that Turkish authorities who accused Levent Kart, the Dean of the Medical Faculty at Fatih University, of being a member of FETÖ arbitrarily detained Levent.

23.    Among the reasons for their conclusion, the Working Group stated that "the essence of the allegations against Mr. Kart is his alleged allegiance with the [GM] which, according to the [Turkish] Government, is evidenced by such regular daily activities as working in a university, having a bank account, and using a communication application. However, the Working Group notes the [Turkish] Government's failure to explain how any of these three alleged activities amounted to a criminal act."

24.    Amnesty International's June 2021 report entitled "Turkey: Weaponizing Counterterrorism: Turkey Exploits Terrorism Financing Assessment to Target Civil Society" explains that "[t]he constellation of counterterrorism laws currently in force in Turkey includes unacceptably broad definitions of 'terrorism' and 'terrorist offender.'"  Specifically, the report noted, "Turkish law defines 'terrorism' in terms of an organization's political aims, rather than by the specific conduct of an offender, *i.e.*, encompassing specific intent to cause death or serious bodily harm."  As a result, "it has become a routine judicial practice to prosecute and convict people for broad and undefined terrorism-related offences without credible and sufficient evidence and on the sole basis of their real or perceived political opinions."

25.    The European Court of Human Rights found that Turkey abused its anti-terrorism provisions, namely Articles 220 and 314 of the Turkish Penal Code, and that the Turkish judiciary has applied these provisions in ways that fundamentally

breach the European Convention on Human Rights.

26.     The United States does not recognize the GM as a terrorist organization.

27.     The United States Department of State said, in its "Country Reports on Terrorism 2019: Turkey", that FETÖ is not designated a terrorist organization in the United States.

28.     The United States Department of State's 2021 Country Report on Human Rights Practices on Turkey said that, since the coup attempt in 2016, the Turkish government has dismissed or suspended thousands of civil servants and government workers, including more than 60,000 police and military personnel and more than 4,000 judges and prosecutors, have arrested or imprisoned more than 95,000 citizens, and closed more than 1,500 non-governmental organizations on "terrorism-related" grounds, mostly due to alleged ties to the GM.

29.     According to the Turkish Minister of the Interior, Süleyman Soylu, as of February 20, 2021, 622,646 individuals were subject to criminal investigations over their alleged membership in an armed terrorist organization because of their links to the GM, with 301,932 of those individuals detained by the police.

30.     These numbers make Turkey the country with the highest number of inmates convicted of terrorism-related offenses, with more than 95% of inmates sentenced for terrorism located in Turkish prisons, according to a Council of Europe report.

31.     Individuals allegedly associated with the GM have disappeared for long periods.  For instance, Hüseyin Galip Küçüközyiğit, a former civil servant, disappeared in Ankara on December 29, 2020, and it was not until July 14, 2021, that Turkish authorities informed his family that he was being held in pre-trial detention. Another former civil servant, Yusuf Bilge Tunç, remained missing after he disappeared in August 2019.

32.     The United Nations Human Rights Council Working Group on Arbitrary Detention, in its September 25, 2020, Opinion No. 47/2020, expressed

concern that the cases against alleged GM members "may constitute crimes against humanity."

33.    The Turkish government does not consider those in custody for alleged GM ties to be political prisoners and does not permit access to them by human rights or humanitarian organizations.

34.    The United Nations Council Working Group on Arbitrary Detention found that Turkey had arbitrarily detained an individual allegedly associated with the GM in violation of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights due to her detention based on political or other opinions.

35.    Many of these investigations and detentions used questionable evidentiary standards and were without the full due process provided for under the law, with some defendants denied access to the evidence underlying the accusations against them.

36.    Adequate representation has also been a concern since the Turkish government's crackdown on members of the GM. Lawyers have been hesitant to take the cases of those accused of GM ties for fear of government reprisal, including prosecution, since many lawyers defending accused terrorists have faced criminal charges themselves.

37.    The Turkish judiciary has problems with independence, having lost nearly one-third of its members following the 2016 coup attempt because of the government suspending, detaining, or firing judges accused of being affiliated with the GM.

38.    In addition to detention and other criminal actions against alleged members of the GM, Turkey has seized and closed hundreds of businesses accused of links to the GM.

39.    Persecution of members of the GM has extended beyond Turkey's borders and has included kidnappings and transfers without due process of alleged

members.

40.     Bekir Bozdag, Turkey's deputy prime minister boasted in 2018 that Turkish secret agents in eighteen countries had seized eighty Turks suspected of having links to the GM.

41.     In July 2021, Erdoğan announced that Turkish intelligence forces captured and returned to Turkey Orhan Inandi from the Kyrgyz Republic.

42.     Mr. Inandi is the head of the Sepat education network, which is associated with the GM.  The Kyrgyz Ministry of Foreign Affairs stated Kyrgyz authorities did not cooperate or have knowledge of the rendition of Mr. Inandi, who is a dual Turkish and Kyrgyz citizen, and requested Turkey return him.

43.     In May 2021, Turkish authorities released a statement that Selahaddin Gülen, a nephew of Gülen, was in government custody after he was captured by the country's intelligence forces in Kenya.

44.     Human Rights Watch reported that he was arrested by Kenyan police in October 2020 because of an INTERPOL red notice from Turkey and opened extradition proceedings against him.  The INTERPOL red notice was issued for an alleged child molestation case, for which Mr. Selahaddin Gülen had been acquitted in 2008. Kenyan authorities did not confirm their involvement in this rendition.

45.     Turkey has sent at least 1,022 extradition requests to 109 countries about perceived members of the GM, and none have been accepted.

46.     The Turkish government has attempted to abuse INTERPOL's notice mechanism to track "Gülenists", but INTERPOL has denied 839 red notice requests submitted by Turkey due to the political nature of these requests.

47.     In 2016, Turkey sent an extradition request to the United States for Gülen.

48.     The United States declined to extradite Gülen, citing a lack of credible evidence.

49.     Turkey resorted to a covert influence effort to convince the government

of the United States to extradite Gülen.

50.     In 2021, the Fourth Circuit Court of Appeals upheld an Eastern District of Virginia jury verdict convicting a man of acting as an agent of the Turkish government within the United States without disclosing that relationship to the United States government.

51.     According to court records, he conspired to act covertly within the United States on instructions of the Turkish government to influence politicians and public opinion publicly and privately in the United States against Gülen with the goal of obtaining his extradition.

52.     News reports have said the Turkish government also spoke with former National Security Adviser to former President Donald Trump, Michael Flynn, about either kidnapping or rendering Gülen to Turkey or using his influence as National Security Adviser to effectuate his extradition.

53.     This was not the first time Turkey requested that the United States extradite Gülen, having previously issued an arrest warrant and requesting that the United States extradite Gülen in 2014.

54.     The Turkish government has limited the mobility of some of its citizens at home and abroad, due to their alleged association with the GM, by cancelling more than 230,000 passports and not permitting GM members to renew their passports or have passports issued by Turkish consulates.

55.     A March 2018 report by the Office of the United Nations High Commissioner for Human Rights found that there were serious due process violations with respect to the designation by the Turkish authorities and that links or connections to FETÖ/PDY were designated without describing the nature of such links and without providing specific evidence or conducting investigations with respect to the individuals designated.

56.     A 2019 report by Human Rights Watch has also identified that charges and sanctions connected with FETÖ/PDY are politically motivated.  Under the

circumstances, no weight should be placed on the reported justification for sanctions without separate and independent verification.

57.    In 2017, Defendant Refinitiv settled a case brought by the Finsbury Park Mosque for damages because of Refinitiv's defamatory listing of the mosque in the "terrorism" category in the World-Check database ("World-Check" or World Check database").

58.    Related to the settlement, Refinitiv's counsel stated, "By its offer of amends the Defendant has admitted that the profile report that it published made the false allegation that there were grounds to suspect that the Claimant had continued connections to terrorism…. The Defendant has removed the defamatory allegations in question and has agreed to pay substantial damages to the Claimant and the Claimant's legal costs."

59.    Defendants' customers, such as banks and other financial intuitions, relied on the assertions by Defendants that the information on World-Check is accurate and reliable.

60.    Relying on the information provided by World-Check, Defendants' customers including, but not limited to, eBay, Inc. and Citibank, N.A, closed accounts of and/or otherwise refused to do business with the Plaintiffs and members of the Classes who were flagged by World-Check as associates of FETÖ.

61.    The Financial Action Task Force ("FATF") has explained the consequences of incorrect implementation of anti-terrorism measures on the targets of these ostensible compliance measures.  In papers entitled "High-Level Synopsis of the Stocktake of the Unintended Consequences of the FATF Standards" (Oct. 27, 2021) and "Opinion of the European Banking Authority on 'de-risking'" (Jan. 5, 2022), FATF stated "de-risking can lead to adverse economic outcomes or amount to financial exclusion.  Financial exclusion is of concern, as access to at least basic financial products and services is a pre-requisite for participation in modern and economic and social life."

62.     Even if an affected individual learns he or she is flagged on World-Check, they are unlikely to convince Defendants to delist them.

63.     According to two anonymous senior World-Check employees, in their eight years they had not seen a single case where an individual successfully challenged their terror designation.

## III.   JURISDICTION AND VENUE

64.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the RICO statute, 18 U.S.C. § 1961, *et seq*.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

65.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332, as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

66.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d), as well as Fed. R. Civ. P. 4(k)(2), because they have minimum contacts with the United States and this State.

67.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant has an office in this District, and it regularly conducts business in the District.

68.     At all material times, Defendants intentionally availed itself of the laws of the United States and of this State by transacting substantial business throughout the United States and California, including but not limited to, the promotion, marketing, advertising, and sale of its services.

## IV.   PARTIES

### A.    The Defendant

69.    Defendant Refinitiv has an office at 6080 Center Drive, Ste. 725, Los Angeles, California 90095. Its principal business office is c/o Refinitiv, 3 Times Square, New York, NY 10036.

70.    The principal business of Refinitiv US LLC is to serve as the United States operating company of Refinitiv US PME LLC, LSEGA. Inc., Refinitiv TW Holdings Ltd., Refinitiv Parent Limited, and London Stock Exchange Group plc ( the "Refinitiv Companies")

71.    Defendant Refinitiv is a provider of financial market data and infrastructure to assist clients in investing, trading, and risk decisions.  Among its products is the World-Check database, which compiles information from a variety of sources, including sanction lists, law enforcement watch lists, and lists of politically exposed persons.

72.    Defendants and the Refinitiv Companies are one of the world's largest providers of financial markets data and infrastructure with over 40,000 customers and 400,000 end users across 190 countries.

73.    Defendants' customers including, but not limited to, Citibank N.A., Barclays, JP Morgan Chase, and eBay, Inc. use the Refinitiv Companies' World Check database to meet their regulatory obligations.

74.    World-Check has a database of persons and entities to help customers comply with know your customer, anti-money laundering, countering financial terrorism, and anti-bribery corruption laws and regulations.

75.    As of 2016, 300 government and intelligence agencies, 49 of the 50 biggest banks, pre-employment vetting agencies, and 9 of the top 10 global law firms, used World-Check.

76.    Among the reasons a person may appear in the World-Check database

are their alleged association with FETÖ.

77.    World-Check includes an "individual" category, which identifies people accused, investigated, arrested, indicted, detained, interrogated, or subjected to trial for crimes, but not yet convicted; politically exposed persons and their close relatives; individuals appearing on law enforcement lists, the Office of Foreign Assets Control, or INTERPOL or are reported as Disqualified Directors; and close relatives of politically exposed persons.

78.    World-Check also includes a "Special Interest" category, which encompasses over sixty tags meant to provide a more granular view of the reason for the record's inclusion on the database, such as "Absconder or Fugitive" and "Explicit Sanctions."

79.    World-Check obtains information about persons and entities from publicly available information, such as sanctions lists, regulatory enforcement, law enforcement, court records, election results, company filings, official company websites, press releases, news reports, journal articles, archived news aggregators, and credible media sources.

80.    Defendants describes World-Check  as "delivering accurate and reliable information" and that its researchers rely on information from "reliable and reputable sources."

81.    However, an investigation found instances of World- Check relying on unreliable sources, such as partisan blogs and websites.

82.    World-Check relies on inaccurate and unreliable information from Turkish government sources, such as the Turkish Ministry of the Interior's terrorist list, to determine which persons to flag as associates of FETÖ.

83.     At present time, the true names and capacities of Defendants sued herein as Does 1 to 10, inclusive, are unknown to Plaintiffs. Upon information and belief, the true names, capacities and acts/omissions of DOE Defendants are contained in records, documents, and other discovery that is unavailable to Plaintiffs

and can only be ascertained through the discovery process. Plaintiffs are informed and believe, and based thereon allege that Defendants Does 1 to 10 are responsible in some manner for the damages and injuries hereinafter complained of. Plaintiffs will ask leave of this Court to amend the complaint to allege such names responsibility when that information is ascertained.

84.     Plaintiffs are informed and believes and thereon allege that Defendants sued herein as DOES 1 through 10, inclusive, were involved in the racketeering, defamatory and other unlawful conduct alleged herein. Each Defendant is the agent of the other. Plaintiff alleges that each of the Defendants named as a "DOE" was in some manner responsible for the acts and omissions alleged herein, and Plaintiff will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained. As the term "Defendants" is used in this complaint, it encompasses both Refinitiv US LLC and the Doe Defendants.

**B.     Plaintiffs**

85.     Yayla is a resident of Pennsylvania.

86.     Atak is a resident of New Jersey.

87.     Kalyoncu is a resident of California.

88.     Yayla, Atak, and Kalyoncu are former residents of Turkey.

89.     In two decisions in April and December 2021, the Turkish government targeted, among others, Yayla, Atak, and Kalayoncu for politically motivated persecution by freezing their assets in Turkey ostensibly under the Law on the Prevention of the Financing of Terrorism, no. 6415.

90.     Yayla, Atak, and Kalyoncu have never been involved in any activity relating to a terrorist organization.

91.     Defendants compiled and distributed profiles of Yayla, Atak, and Kalyoncu through World-Check.

92.     At the end of 2021, Yayla was flagged on World-Check as "non-

conviction terror", with the Special Interest Categories "Terror Related; Frozen and Seized Assets."

93.    On March 29, 2022, Yayla sent a message to Defendants, requesting removal of his report on World-Check.

94.    On April 29, 2022, Defendants responded to Yayla's request for removal by refusing to remove his record and by proposing a compromise in which they would change Yayla's report to say he is an individual who is a "[r]eported associate [of FETÖ]."

95.    World-Check also changed the Special Interest Categories in which Yayla was tagged to "Absconder or Fugitive; Explicit Sanctions."

96.    On May 3, 2022, Yayla again requested that Defendants remove his report from World-Check.

97.    Defendants rejected Yayla's request on May 3, 2022.

98.    Between December 29, 2021, and January 23, 2023, Atak was listed as a "non-conviction terror" and was tagged within the Special Interest categories "Terror Related; Frozen and Seized Assets."

99.    Atak requested that Defendants remove his report from World Check.

100.   On January 23, 2023, Defendants responded to Atak's request for removal by refusing to remove his record and by proposing a compromise in which they would change Atak's report to say he is an individual who is a "[r]eported associate [of FETÖ]."

101.   As of January 11, 2023, Kalyoncu was listed on World-Check as "non-conviction terror" and "individual" and was tagged within the Special Interest categories "Terror Related; Frozen and Seized Assets; Absconder or Fugitive; Explicit Sanctions."

102.   By March 8, 2023, World-Check updated Kalyoncu's report, listing him as an "individual" and tagging him within the Special Interest categories "Frozen and Seized Assets; Absconder or Fugitive; Explicit Sanctions."

103. The Plaintiffs face ongoing harm due to their designations on Defendants' World-Check database.

## V.   CLASS ACTION ALLEGATIONS

104. Plaintiffs bring this class action on behalf of themselves, and all others similarly situated, under Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the following Nationwide Classes:

> a. The Nationwide Damages Class: "All persons in the United States associated with FETÖ according to Defendant's World-Check database until the entry of judgment in this case or such other time determined by the Court."

> b. The Nationwide Injunctive Relief Class: "All persons in the United States associated with FETÖ according to Defendant's World-Check database, or who in the future may be identified as associates of FETÖ based on their identification as such on a terrorist or similar watch list generated by the Turkish government."

105. Plaintiffs bring this class action on behalf of themselves, and all others similarly situated, under Rule 23(b)(3) on behalf of the following state damages classes under the applicable jurisdictions' consumer protection or other applicable laws (the "State Damages Classes"):

> a. The California Damages Class is defined as:
>
> All persons residing in the state of California associated with FETÖ according to Defendants' World-Check database until the entry of judgment in this case or such other time determined by the Court.

> b. The Illinois Damages Class is defined as:
>
> All persons residing in the state of Illinois associated with FETÖ according to Defendants' World-Check database until the entry of judgment in this case or such other time determined by the Court.

> c. The Maryland Damages Class is defined as:

All persons residing in the state of Maryland associated with FETÖ according to Defendants' World-Check database until the entry of judgment in this case or such other time determined by the Court.

d.  The New Jersey Damages Class is defined as:

All persons residing in the state of New Jersey associated with FETÖ according to Defendants' World-Check database until the entry of judgment in this case or such other time determined by the Court."

e.  The New York Damages Class is defined as:

All persons residing in the state of New York associated with FETÖ according to Defendants' World-Check database until the entry of judgment in this case or such other time determined by the Court.

f.  The Pennsylvania Damages Class is defined as:

All persons residing in the state of Pennsylvania associated with FETÖ according to Defendants' World-Check database until the entry of judgment in this case or such other time determined by the Court.

g.  The Virginia Damages Class is defined as:

All persons residing in the state of Virginia associated with FETÖ according to Defendants' World-Check database until the entry of judgment in this case or such other time determined by the Court.

106.  Additionally, Plaintiffs bring this class action on behalf of themselves, and all others similarly situated, for injunctive relief under Rule 23(b)(2) on behalf of the parallel state injunctive relief classes under the applicable jurisdictions' consumer protection or other applicable laws (the "State Injunctive Relief Classes"). The class definitions for the various State Injunctive Relief Classes is the same as for each identified State's Damages Classes with the additional language that it includes those who in the future may be identified as associates of FETÖ based on their identification as such on a terrorist or similar watch list generated by the Turkish

government.

107.   Plaintiffs and Class Members have suffered injury to their businesses or property because of Defendants' unlawful conduct as alleged herein as provided in 18 U.S.C §§ 1962 et seq., and have suffered reputational and non-economic injuries, including but not limited to emotional distress damages, as a result of Defendants' unlawful conduct. They have also suffered and, without intervention by this Court, will continue to suffer irreparable harm for which there is no adequate remedy at law in that their rights, as alleged herein, have been and will continue to be systematically violated.

108.   Excluded from the Nationwide Class, State Classes, and State Injunctive Relief Classes (together, the "Classes") are Defendants, any entity in which Defendants have a controlling interest, including the Refinitiv Companies, and their officers, directors, legal representatives, successors, subsidiaries, and assigns. The Classes also exclude any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

109.   The Nationwide Class is so numerous that joinder of all members would be impractical because the class has hundreds, or thousands, of members geographically dispersed throughout the United States.

110.   Each of the State Classes and State Injunctive Relief Classes are so numerous that joinder is impractical because, on information and belief each State Class has hundreds of members, and at a minimum well in excess of 40 members.

111.   There are numerous questions of law and fact that are common to the claims of the Nation Class members and the State Classes members (the "Class Members") including:

(a)   whether Defendants engaged in conduct actionable under the RICO statute;

(b)   whether Defendants were and are a "person," as that term is

defined in 18 U.S.C. § 1961(3);

(c)     whether the Defendants, the Refinitiv Companies, and Refinitiv's United States subscribers constitute a RICO enterprise within the meaning of 18 U.S.C. § 1961(4);

(d)     whether, alternatively, the Defendants, the Refinitiv Companies, Refinitiv's United States subscribers, and the Republic of Turkey ("Turkey").   constitute an association-in-fact within the meaning of 18 U.S.C. § 1961(4);

(e)     whether Defendants are a "person" that conducted the affairs of the "Refinitiv Enterprise" through the "pattern of racketeering activity;"

(f)     whether Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5);

(g)     whether Defendants have engaged in "racketeering activity" indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud);

(h)     whether Plaintiffs and each member of the Nationwide Class were and are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c);

(i)     whether Plaintiffs and each member of the Nationwide Class have been injured in his or her business or property as a direct and proximate result of Defendants' illegal conduct in violation of 18 U.S.C. § 1962(c);

(j)     whether Refinitiv violated the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200);

(k)     whether Refinitiv violated California common law and Cal. Civ. Code §§ 44, *et seq.*;

(l)     whether Refinitiv violated the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS §§ 505/1, *et seq.*) and the Illinois Uniform Deceptive Trade Practices Act (815 ILCS §§ 510/1, *et seq.*);

(m)     whether Refinitiv defamed the Illinois Class under the State's common law;

(n)     whether Refinitiv defamed the Maryland Class under the State's common law;

(o)     whether Refinitiv defamed the New Jersey Class under the State's common law;

(p)     whether Refinitiv violated the New York General Business Law (N.Y. GBL § 349);

(q)     whether Refinitiv defamed the New York Class under the State's common law;

(r)     whether Refinitiv defamed the Pennsylvania Class under the State's common law and 42 Pa. C.S.A. §§ 8341, *et seq.*;

(s)     whether Refinitiv defamed the Virginia Class under the State's common law;

(t)     whether Defendants acted falsely or misleadingly in claiming the World-Check is "delivering accurate and reliable information" and that its researchers rely on information from "reliable and reputable sources";

(u)     whether Defendants' deceptive acts had the capacity or tendency to deceive, and in fact did deceive, a reasonable consumer; and

(v)     whether the Class Members were injured because of Defendants' deceptive acts or practices.

112.   Plaintiffs are typical of other members of their respective Classes because all were subject to the same unfair and deceptive representations and actions and face ongoing injuries due to the conduct of Defendant as the cause of Plaintiffs' ongoing harm is Defendants' misleading tagging of Plaintiffs' names on the World-Check.

113.   Plaintiffs are adequate representatives of the Classes because their interests are not antagonistic to those of the proposed classes and because they are

committed to litigating the case.

114.   Plaintiffs are represented by counsel with extensive experience in class action and complex litigation.

115.   The Class Members are ascertainable as the name of each Class Member appears in the World-Check database.

116.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

117.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

118.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant.

## VI.   **CLAIM I**

### (VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(C)) ON BEHALF OF THE NATIONWIDE CLASS)

119.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

120.   This Claim is brought on behalf of the Nationwide Class.

121.   Plaintiffs and members of the Nationwide Class are each a "person" within the meaning of 18 USC § 1961(3).

122.   Defendants are a "person" within the meaning of 18 USC § 1961(3).

123.   Defendants, the Refinitiv Companies, and Refinitiv's United States

subscribers constitute an associated-in-fact enterprise within the meaning of §§ 1961(4) and 1962(c) ("Enterprise 1"). The pattern of racketeering activity described herein was conducted through that enterprise.

124.   Defendants, the Refinitiv Companies, Refinitiv's United States subscribers and Turkey and also constitute an associated-in-fact enterprise within the meaning of §§ 1961(4) and 1962(c) ("Enterprise 2"). The pattern of racketeering activity described herein was conducted through that enterprise.

125.   Each Enterprise affects interstate commerce because Defendants have sold and continue to sell their World-Check database across the United States and around the world, which included the false and fraudulent statements in the course of which the pattern of racketeering activity alleged herein occurred.

126.   Each Enterprise had the common purpose of promulgating, disseminating and receiving the false and fraudulent information provided by the Turkish government to Refinitiv; each had an ongoing organizational structure in that false and fraudulent information regarding the class members was regularly and over many years promulgated, disseminated and received on an ongoing basis.

127.    Refinitiv (as well the unnamed Turkish government) engaged in acts of racketeering in violation of 18 U.S.C. § 1962(c), namely wire fraud as proscribed by 18 U.S.C. § 1343. Refinitiv (and the unnamed Turkish government) conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(c).

128.   Refinitiv (and the unnamed Turkish government) engaged in a scheme to defraud the public in general, by transmitting inaccurate and unreliable information on World-Check about Plaintiffs and members of the Nationwide Class, obtained from Turkish government sources while simultaneously making misleading statements on Defendants' website that World-Check is "delivering accurate and reliable information" and that its researchers rely on information from "reliable and reputable sources."

129.   Defendants communicated by wire as part of the scheme by reporting

the Turkish government's inaccurate and unreliable information about Plaintiffs and the Nationwide Class members on its online World-Check database, while misleadingly communicating to visitors to its website about the reliability and accuracy of World-Check's information.

130.   Defendants intended to deceive, and in fact did deceive, its customers, who relied on its false and misleading statements, communicated through the wires, about World-Check in deciding to depend on World-Check's assertions about Plaintiffs and the Nationwide Class members in making decisions about whether to conduct business with Plaintiffs and the Nationwide Class members. Alternatively, Defendants acted with reckless disregard for the truth in promulgating and disseminating false and fraudulent information as alleged above.

131.   The Turkish government intended to deceive, and in fact did deceive, the public via each Enterprise about the terrorist status of Plaintiffs and members of the Nationwide Class, and Refinitiv's customers wrongfully relied on that information, which was communicated through the wires on Defendants' online World-Check database.

132.   The Turkish government intended to, and in fact did, deprive Plaintiffs and Class members of money or property via each Enterprise by inducing Defendants' customers to close the accounts of, or otherwise not do business with, Plaintiffs and Class members due to the reliance of Defendants' customers on its inaccurate and unreliable information about Plaintiffs and Class members. Alternatively, Defendants acted with reckless disregard for the truth in promulgating and disseminating false and fraudulent information as alleged above,

133.   Defendants willfully or knowingly conducted or participated in, directly or indirectly, the affairs of each Enterprise through a pattern of racketeering activity as defined by U.S.C. § 1961(5), including multiple predicate acts that were related to each other and pose a threat of continued racketeering activity.

134.   The Turkish government has published at least two inaccurate and

unreliable lists of alleged terrorists affiliated with the GM, which were then promulgated, disseminated and received through the activities of each Enterprise.

135.   Defendants have used, directed the use of, or caused to be used wire communications to relay the Turkish government's lists and other information obtained from Turkish government sources on World-Check and regularly updates the database in furtherance of the Enterprise's scheme to defraud.

136.   The pattern of racketeering alleged herein is ongoing as Defendants continue to report on World-Check inaccurate and unreliable information from Turkish government sources yet continues to advertise on its website that World-Check contains accurate and reliable information.

137.   Plaintiffs and members of the Nationwide Class were substantially injured and damaged because of the Enterprise's pattern of racketeering activity alleged herein in that said racketeering activity was a proximate cause in closing class members' accounts and otherwise because Refinitiv's customers would not have closed the accounts or otherwise depriving the Nationwide Class of the ability to do business with those Refinitiv customers if not for their reliance on World-Check and the underlying false, unreliable and inaccurate information provided by the Turkish government.

## VII.   CLAIM II

### (VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200) ON BEHALF OF THE NATIONWIDE CLASS)

138.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

139.   This Claim is on behalf of the Nationwide Class.

140.   Defendants are a "person" under Cal. Bus. & Prof. Code § 17201.

141.   Some of Refinitiv's conduct as alleged herein occurred in California.

142.   Defendants' conduct was fraudulent and deceptive because its

misrepresentations about Plaintiffs and members of the Nationwide Class in its World-Check database had the capacity or tendency to deceive, and in fact did deceive, reasonable consumers who depended on World-Check's database to make decisions about whether to conduct business with Plaintiffs and the Nationwide Class.

143.    Based on these misrepresentations, some of Defendants' customers decided not to do business with Plaintiffs and Nationwide Class members.

144.    Defendants' conduct is also unlawful in that it violates RICO, 18 U.S.C. § 1961, et seq.

145.    Plaintiffs and members of the Nationwide Class were injured economically because of Defendants' conduct and because Defendants' customers would not have closed their accounts or otherwise deprived them of conducting business if not for their reliance on World-Check.

146.    By reason of the foregoing Plaintiffs and the Nationwide Class have been damaged in an amount to be proven at trial.

## VIII.  <u>CLAIM III</u>

### (<u>VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200) ON BEHALF OF THE CALIFORNIA CLASS</u>)

147.    Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

148.    This Claim is brought on behalf of the California Class.

149.    Defendants are a "person" under Cal. Bus. & Prof. Code § 17201.

150.    Defendants' conduct was fraudulent and deceptive because its misrepresentations about Plaintiffs and members of the Class in its World-Check database had the capacity or tendency to deceive, and in fact did deceive, reasonable consumers who depended on World-Check's database to make decisions about whether to conduct business with Plaintiffs and class members.

151.   Based on these misrepresentations, Defendants' customers decided not to do business with members of the California Class.

152.   Defendants' conduct is also unlawful in that it violates RICO, 18 U.S.C. § 1961, et seq.

153.   Members of the Class were injured economically because of Defendants' conduct because Defendants' customers would not have closed their accounts or otherwise deprived them of business if not for their reliance on World-Check.

154.   By reason of the foregoing, the California Class has been damaged in an amount to be proven at trial.

## IX.   CLAIM IV

### (DEFAMATION AT COMMON LAW AND CAL. CIV. CODE §§ 44, *ET SEQ.* ON BEHALF OF THE CALIFORNIA CLASS)

155.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

156.   This Claim is brought on behalf of the California Class.

157.   Defendants have published on their World-Check database purportedly factual records about the Plaintiffs and members of the class, falsely designating them as members of a terrorist organization.

158.   On information and belief, Defendants regularly republish the libelous records on World-Check and directs the republications to each new client.

159.   The libelous records are defamatory *per se* because Defendants state that Kalyoncu and members of the California Class are affiliated with a terrorist organization, which is a claim that requires no explanatory matter.

160.   The libelous records published by Defendants on Kalyoncu and members of the California Class have exposed them to hatred, contempt, ridicule, or obloquy, or which causes them to be shunned or avoided, or which has a tendency to

injure them in their occupation, by causing Defendants' customers to refuse to do business with them.

161.   Defendants knew or disregarded clear evidence that their libelous statements were false because neither the United States, nor any other government outside of Turkey, recognizes alleged members of the GM as terrorists.

162.   By reason of the foregoing, the California Class has been damaged in an amount to be proven at trial.

## X.   CLAIM V

**(VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS §§ 505/1, *ET SEQ.*) AND THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT (815 ILCS §§ 510/1, *ET SEQ.*) ON BEHALF OF THE ILLINOIS CLASS)**

163.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

164.   This Claim is brought on behalf of the Illinois Class.

165.   The Illinois Class and Defendants are "persons" under 815 ILCS § 505/1 and 815 ILCS § 510/1.

166.   Defendants engaged in unfair or deceptive acts or practices by making false representations to the public about the reliability and accuracy of the information on its World-Check database, portraying the database on its website as "delivering accurate and reliable information" and its researchers as relying on information from "reliable and reputable sources", while at the same time citing inaccurate and unreliable information from the Turkish government.

167.   Defendants' conduct constitutes the following additional prohibited deceptive trade practices prohibited by 815 ILCS § 510/2: (a) misrepresenting that World-Check has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that Defendants have a sponsorship, approval, status, affiliation, or connection that they do not have; (b) misrepresenting that the

information on World-Check is of a particular standard, quality, or grade or is of a particular style or model, when it is of another; (c) advertise World-Check with intent not to sell it as advertised; and (4) engaging in any other conduct which similarly creates a likelihood of confusion between the parties or actual confusion or misunderstanding.

168.   Defendants' conduct was deceptive because its misrepresentations had the capacity or tendency to deceive, and in fact did deceive, reasonable consumers who depended on World-Check's database to make decisions about whether to conduct business members of the Illinois Class.

169.   Defendants'      customers      were      deceived      by      Defendants' misrepresentations that the Illinois Class are members of a terrorist organization.

170.   Defendants intended for consumers to rely on such deceptive acts or practices, and its consumers in fact did rely on such misrepresentations.

171.   Defendants' customers would not have purchased Refinitiv's World-Check products and services or closed the Illinois Class members' accounts, or otherwise deprived them of business, if not for their reliance on World-Check.

172.   Defendants' customers relied on Defendants' unfair or deceptive trade practices to the detriment of the Illinois Class.

173.   Based on the inaccurate and unreliable information Defendants' customers received from Defendants' World-Check database on the Illinois Class, many of Defendants' customers refused to do business with Illinois Class members.

174.   Defendants' unfair and deceptive trade practices caused substantial injury and damage to the Illinois Class because, absent Defendants' unfair and deceptive conduct, Defendants' customers would not have closed the Illinois Class's accounts or otherwise not to do business with them, which resulted in financial harm to the Illinois Class.

175.   Defendants' conduct is directed at the market generally and generally affects consumer protection concerns because hundreds of individuals have been

flagged in the World-Check database as associates of FETÖ.

176.   This flagging is based on information provided to Defendants by the Turkish government and because the World-Check database is used by many of the largest financial institutions, government and intelligence agencies, pre-employment vetting agencies, and law firms to make decisions about whether to do business with the Illinois Class.

177.   Because of the foregoing, the Illinois Class has been damaged in an amount to be determined at trial.

178.   A copy of this Complaint shall be mailed to the Illinois Attorney General in accordance with 815 ILCS § 505/10a (d).

## XI.   CLAIM VI

### (DEFAMATION ON BEHALF OF THE ILLINOIS CLASS)

179.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

180.   This Claim is brought on behalf of the Illinois Class.

181.   Defendants have published on their World-Check database records about members of the Illinois Class, falsely designating them as members of a terrorist organization.

182.   On information and belief, Defendants regularly republish the libelous records on World-Check and directs the republications to each new client.

183.   The libelous records are defamatory *per se* because Defendants' allegations that the Illinois Class are affiliated with a terrorist organization are words that impute commission of a crime.

184.   The libelous records published by Defendants about the Illinois Class have caused them injury to their reputations such that Defendants' customers refuse to do business with them because of these libelous statements.

185.   Defendants knew that its libelous statements were false or lacked

reasonable grounds for their belief that its statements were true because neither the United States, nor any other government outside of Turkey, recognizes alleged members of the GM as terrorists.

186. Because of the foregoing, the Illinois Class has been damaged in an amount to be determined at trial.

## XII.   CLAIM VII

### (DEFAMATION ON BEHALF OF THE MARYLAND CLASS)

187. Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

188. This Claim is on behalf of the Maryland Class.

189. Defendants have published on their World-Check database records about the members of the Maryland Class, falsely designating them as members of a terrorist organization.

190. The libelous records are defamatory *per se* because Defendants' allegations that members of the Maryland Class are affiliated with a terrorist organization are statements falsely attributing criminality.

191. On information and belief, Defendants regularly republish the libelous records on World-Check and directs the republications to each new client.

192. Defendants knew or disregarded clear evidence that its libelous statements were false because neither the United States, nor any other government outside of Turkey, recognizes alleged members of the GM as terrorists.

193. The libelous records published by Defendants about members of the Maryland Class have exposed them to public scorn, hatred, contempt, or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, them as evidenced by the fact that Defendants' customers refuse to do business with them because of these libelous statements.

194. Because of the foregoing, the Maryland Class has been damaged in an amount to be determined at trial.

# XIII.  CLAIM VIII

## (DEFAMATION ON BEHALF OF THE NEW JERSEY CLASS)

195.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

196.   This Claim is brought on behalf of the New Jersey Class.

197.   Defendants have published on their World-Check database records about the Plaintiffs and members of the New Jersey Class, falsely designating them as members of a terrorist organization.

198.   The libelous records are defamatory *per se* because Defendants' allegations that Plaintiffs and members of the New Jersey Class are affiliated with a terrorist organization are statements falsely attributing criminality.

199.   On information and belief, Defendants regularly republish the libelous records on World-Check and directs the republications to each new client.   For instance, on January 23, 2023, Defendants republished and modified Atak's record on World-Check with new information.

200.   Defendants knew or disregarded clear evidence that its libelous statements were false because neither the United States, nor any other government outside of Turkey, recognizes alleged members of the GM as terrorists.

201.   The libelous records published by Defendants about Plaintiffs and members of the New Jersey Class have lowered their reputations in the estimation of the community or deterred third persons from associating with them such that Defendants' customers refuse to do business with them as evidenced by the fact that Defendants' customers refuse to do business with them because of these libelous statements.

202.   Because of the foregoing, the New Jersey Class has been damaged in an amount to be determined at trial.

XIV.  **CLAIM IX**

(**V**IOLATION OF THE **N**EW **Y**ORK **G**ENERAL **B**USINESS **L**AW
(N.Y. GBL § 349) ON **B**EHALF OF THE **N**EW **Y**ORK **C**LASS

203.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

204.   This Claim is brought on behalf of the New York Class.

205.   Defendants engaged in deceptive acts or practices in the conduct of its business or in furnishing services by misleadingly portraying, on its website, that the World-Check database is "delivering accurate and reliable information" and that its researchers rely on information from "reliable and reputable sources", while actually delivering inaccurate and unreliable information about members of the New York Class furnished by the Turkish government.

206.   Defendants' conduct was deceptive because its misrepresentations were likely to mislead, and in fact did mislead, reasonable consumers acting reasonably under the circumstances who depended on World-Check's database to make decisions about whether to conduct business with members of the New York Class. Defendants' customers were deceived by Defendants' misrepresentations that the New York Class members are members of a terrorist organization.

207.   By placing these misrepresentations about the accuracy of World-Check prominently on its publicly available website, as a way of advertising to potential customers, Defendants directed its deceptive conduct to the consuming public.

208.   Defendants' deceptive conduct significantly impacts the consuming public because hundreds of individuals have been flagged in the World-Check database as associates of FETÖ  based on information provided to Defendants by the Turkish government, and because the World-Check database is used by many of the largest financial institutions, government and intelligence agencies, pre-employment vetting agencies, and law firms to make decisions about whether to do business with

1    the New York Class.

2        209.   Based on the inaccurate and unreliable information Defendants'

3    customers received from Defendants' World-Check database on the New York Class,

4    including that they are associates of FETÖ and on the terrorist Grey List based on

5    information provided to Defendants by the Turkish government, many of

6    Defendants' customers refused to business with the New York Class.

7        210.   Defendants' deceptive conduct actually and proximately caused injury

8    and damage to New York Class members because, absent Defendants' deceptive

9    conduct, Defendants' customers would not have engaged Defendants' World-Check

10   services and further they would not have closed New York Class Members' accounts

11   or otherwise decided not to do business with them, which resulted in financial harm

12   to the New York Class.

13       211.   Because of the foregoing, the New York Class has been damaged in an

14   amount to be determined at trial.

15                          **XV.   CLAIM X**

16             **(DEFAMATION ON BEHALF OF THE NEW YORK CLASS)**

17       212.   Plaintiffs repeat and reallege each prior and subsequent paragraph of

18   this complaint as if fully set forth herein.

19       213.   This Claim is brought on behalf of the New York Class.

20       214.   Defendants have published on their World-Check database records

21   about the New York Class members, falsely designating them as members of a

22   terrorist organization.

23       215.   On information and belief, Defendants regularly republish the libelous

24   records on World-Check and directs the republications to each of its clients.

25       216.   Defendants knew or disregarded clear evidence that its libelous

26   statements were false because neither the United States, nor any other government

27   outside of Turkey, recognizes alleged members of the GM as terrorists and Plaintiffs

28   informed Defendants of the falsity of the statements.

217.   The libelous records are defamatory *per se* because Defendants' allegations that members of the New York Class are affiliated with a terrorist organization are charges of a serious crime.

218.   The libelous records published by Defendants about New York Class members have exposed them to public contempt, ridicule, aversion, or disgrace, or induced an evil opinion of them and deprived them of their friendly intercourse in society, as evidenced by the fact that Defendants' customers refuse to do business with them because of these libelous statements.

219.   Because of the foregoing, the New York Class has been damaged in an amount to be determined at trial.

## XVI.  CLAIM XI
### (DEFAMATION AT COMMON LAW AND 42 PA. C.S.A. §§ 8341, *ET SEQ.*  ON BEHALF OF THE PENNSYLVANIA CLASS)

220.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

221.   This Claim is brought on behalf of the Pennsylvania Class.

222.   Defendants have published on their World-Check database records about the Plaintiffs and members of the Pennsylvania Class, falsely designating them as members of a terrorist organization.

223.   The libelous records published by Defendants about Plaintiffs and members of the class have harmed their reputation and lowered them in the estimation of the community or deterred third persons from associating or dealing with them, as evidenced by the fact that Defendants' customers refuse to do business with them because of these libelous statements.

224.   On information and belief, Defendants regularly republish the libelous records on World-Check and directs the republications to each of its clients.

225.   Defendants' customers were the recipients of the libelous reports, and

they understood the defamatory meaning of the reports when they closed the accounts of Plaintiffs and members of the class or otherwise refused to do business with them.

226.   The libelous records are defamatory *per se* because Defendants' allegations that Plaintiffs and members of the Pennsylvania Class are affiliated with a terrorist organization are charges of a serious crime.

227.   Defendants knew or disregarded clear evidence that its libelous statements were false because neither the United States, nor any other government outside of Turkey, recognizes alleged members of the GM as terrorists.

228.   Because of the foregoing, the Pennsylvania Class has been damaged in an amount to be determined at trial.

## XVII. CLAIM XII
### (DEFAMATION ON BEHALF OF THE VIRGINIA CLASS)

229.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

230.   This Claim is brought on behalf of the Virginia Class.

231.   Defendants have published on their World-Check database purportedly factual records about members of the Virginia Class, falsely designating them as members of a terrorist organization.

232.   On information and belief, Defendants regularly republish the libelous records on World-Check and direct the republications to each new client.

233.   The libelous records are defamatory *per se* because Defendants' alleged members of the Virginia Class are affiliated with a terrorist organization, which is a claim that attributes to them the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.

234.   The libelous records published by Defendants about members of the Virginia Class have harmed their reputation and lowered them in the estimation of

the community or deterred third persons from associating or dealing with them, as evidenced by the fact that Defendants' customers refuse to do business with them because of these libelous statements.

235.   Defendants knew or disregarded clear evidence that their libelous statements were false because neither the United States, nor any other government outside of Turkey, recognizes alleged members of the GM as terrorists.

236.   Because of the foregoing, the Virginia Class has been damaged in an amount to be determined at trial.

## XVIII.    CLAIM XIII

### (INJUNCTIVE RELIEF ON BEHALF OF THE NATIONWIDE CLASS)

237.   Plaintiffs repeat and reallege each prior and subsequent paragraph of this complaint as if fully set forth herein.

238.   Absent an injunction by the Court directing the Defendants to remove the names of members of the Nationwide Class from the World Check database as associates of FETÖ, and to refrain from, Plaintiffs and the Nationwide Class will continue to suffer harm at the hands of the Defendants.

239.   Plaintiffs have no adequate remedy at law.

## XIX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the class, respectfully request that this Court:

A.     Declare that the allegations contained herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure for both damages under Rule 23(b)(3) and injunctive relief under Rule 23(b)(2), issue an order certifying the class/classes as defined above, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

B.     Injunctive relief directing the Defendants to remove the names of

members of the Nationwide Class from the World Check database as associates of FETÖ, and to refrain in the future from identifying people as associates of FETÖ based on their identification as such on a terrorist or similar watch list generated by the Turkish government;

C.     Restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to Defendant's actions.

D.     Damages pursuant to 18 U.S.C. § 1964(c) to class members' business or property according to proof;

E.     Economic, reputational and non-economic damages, including emotional distress damages, according to proof, for the state damages classes;

F.     Injunctive relief directing the Defendants to remove the names of members of the State Injunctive Relief Classes from the World Check database as associates of FETÖ, and to refrain in the future from identifying people as associates of FETÖ based on their identification as such on a terrorist or similar watch list generated by the Turkish government;

G.     Award reasonable attorney's fees, experts' fees, and costs; and

H.     Any other relief the Court deems appropriate.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## XX.   JURY DEMAND

2          Plaintiffs hereby demand a jury trial.

3

4    Dated: May 11, 2023              Respectfully submitted,

5                                     **MCLANE, BEDNARSKI**
6                                     **+ LiTT, LLP**

7                                     By: */s/ Barrett S. Litt*
8                                          Barrett S. Litt

9                                     Robert S. Schachter (pro hac vice forthcoming)
10                                    Jessica C. Hermes (pro hac vice forthcoming)
                                      **ZWERLING, SCHACHTER &**
11                                    **ZWERLING, LLP**

12                                    Ahmet Seyithanoglu (pro hac vice forthcoming)
13                                    **SEYITHAN LAW PC**

14

15                                    *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28